Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| JENNIFER HARRISON Y OTROS<br><br>Recurridos<br><br>v.<br><br>MUNICIPIO AUTÓNOMO DE SAN JUAN; **MAPFRE PRAICO INSURANCE COMPANY; AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS**; ÓPTIMA SEGUROS PERSONA A; CARIDAD SÁNCHEZ LUCIANO, FULANO DE TAL Y LA SOCIEDAD LEGAL DE BIENES GANANCIALES POR ELLOS CONSTITUIDA; ASEGURADORA A; ASEGURADORA B; Y ASEGURADORA C; Peticionarios | TA2025CE00142 | *CERTIORARI*<br>Procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Civil Núm.: SJ2023CV03293 (808)<br><br>Sobre: Daños y Perjuicios |

Panel integrado por su presidenta, la Juez Brignoni Mártir, la Jueza Álvarez Esnard y la Jueza Prats Palerm.

Álvarez Esnard, jueza ponente

## **RESOLUCIÓN**

En San Juan, Puerto Rico, a 6 de agosto de 2025.

Comparece ante nos la Autoridad de Acueductos y Alcantarillados ("AAA") y MAPFRE Praico Insurance Company ("MAPFRE") (en conjunto "los Peticionarios") mediante *Petición de Certiorari* presentada el 14 de julio de 2025. Nos solicita la revocación de la *Resolución* emitida y notificada el 13 de junio de 2025, por el Tribunal de Primera Instancia, Sala Superior de San Juan ("foro primario" o "foro *a quo*"). Por virtud del aludido dictamen, el foro primario declaró *No Ha Lugar* una moción de sentencia sumaria instada por los Peticionarios toda vez que determinó la existencia de hechos materiales en controversia que ameritaban la celebración de un juicio en su fondo.

Por los fundamentos que expondremos a continuación, **denegamos** el recurso de epígrafe.

### I.

El 19 de abril de 2023 Jennifer Harrison ("señora Harrison" o "Recurrida") y Luis Gómez presentaron *Demanda* sobre daños y Perjuicios contra MAPFRE, el Municipio Autónomo de San Juan ("Municipio"), Óptima Seguros ("Óptima"), la AAA y varios demandados identificados con nombres ficticios.[1] En esta, la señora Harrison alegó que, el 22 de abril de 2022, a eso de las 6:00 pm, mientras caminaba por la acera de la calle Cacique en Santurce en las inmediaciones de la propiedad número 1954, cayó en la acera tras tropezar con un desnivel entre la superficie de la misma y la caja de un contador de agua ubicada en dicho lugar. Sostuvo que pisó el desnivel en la acera con el pie izquierdo, perdió el balance y cayó hacia al frente, sobre la superficie de la aludida acera, lo que le provocó múltiples lesiones.

Por estos hechos, la Recurrida solicitó una suma no menor de cien mil dólares ($100,000.00) por los daños físicos sufridos como consecuencia de la caída; cincuenta mil dólares ($50,000.00) por una incapacidad parcial permanente en las áreas lesionadas; cincuenta mil dólares ($50,000.00) por angustias mentales y sufrimientos morales; quince mil dólares ($15,000.00) por gastos médicos más quince mil dólares ($15,000.00) adicionales en gastos médicos reclamables a su plan médico.

En respuesta, el 16 de junio de 2023, los Peticionarios, presentaron *Contestación a Demanda.*[2] Mediante esta, negaron ciertas alegaciones y levantaron sus defensas afirmativas. Por su parte, el 19 de junio de 2023, el Municipio y Óptima presentaron

---

[1] Véase, SUMAC TPI, Entrada 1.
[2] Véase, SUMAC TPI, Entrada 16.

*Contestación a Demanda.*[3] En esta, de igual forma, negaron algunas alegaciones contenidas en la demanda y levantaron sus correspondientes defensas afirmativas.

Así las cosas, tras varios tramites procesales, el 24 de marzo de 2025, los Peticionarios presentaron *Moción de Sentencia Sumaria Parcial.*[4] Por virtud de este escrito, argumentaron que no tenían jurisdicción ni control sobre la acera donde ocurrió el accidente, por lo que no le correspondía repararlo ni darle mantenimiento. Cónsono con lo anterior, solicitaron la desestimación de la causa de acción instada por la Recurrida contra éstos. Por su lado, el 16 de abril de 2025, la Recurrida sometió *Oposición a Solicitud de Sentencia Sumaria Parcial.*[5] En esta, expuso que la AAA tenía conocimiento del desnivel de la tapa de su contador de agua y la superficie de la acera en el lugar donde ocurrió la caída y no tomó ninguna acción para corregir dicha situación. A su vez, el 21 de abril de 2025 el Municipio y Óptima, presentaron *Oposición a Moción de Sentencia Sumaria Parcial.*[6] Mediante la misma, adujeron que existían hechos materiales en controversia respecto a la responsabilidad los Peticionarios toda vez éstos tenían conocimiento directo durante años de la alegada condición peligrosa y su omisión de tomar algún tipo acción.

Evaluadas las posturas de las partes, el 13 de junio de 2025, el foro primario emitió y notificó *Resolución.*[7] Mediante la misma, determinó los siguientes hechos como incontrovertidos:

1. La parte demandante alega que el 22 de abril de 2022 como a las 6:00 p.m., aproximadamente, mientras la codemandante Jennifer Harrison se encontraba caminando en dirección ESTE por la acera SUR de la Calle Cacique en las inmediaciones de la propiedad con el número 1954 de Santurce, Puerto Rico, sufrió una aparatosa caída al pisar un desnivel existente entre la mencionada acera, propiedad y jurisdicción de la

---

[3] Véase, SUMAC TPI, Entrada 16.
[4] Véase, SUMAC TPI, Entrada 83.
[5] Véase, SUMAC TPI, Entrada 85.
[6] Véase, SUMAC TPI, Entrada 87.
[7] Véase, SUMAC TPI, Entrada 87.

codemandada MUNICIPIO AUTÓNOMO DE SAN JUAN y un contador de agua de la codemandada AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS.

2. La parte demandante alega que Jennifer Harrison pisó el desnivel existente en la acera con su pie izquierdo, perdió el balance y cayó hacia el frente, sobre la superficie de la acera.

3. El 1 de agosto de 2022, Laiza M. Pizarro Santiago, Profesional de Apoyo Técnico de la AAA, inspeccionó y tomó fotografías del "desnivel existente entre la….acera, propiedad y jurisdicción de la codemandada MUNICIPIO AUTÓNOMO DE SAN JUAN y un contador de agua de la codemandada AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS," mencionados en el párrafo 1 de la demanda.

4. La AAA es una corporación pública y autónoma del Estado Libre Asociado de Puerto Rico, facultada para ser demandada y demandar, creada por la Ley Núm. 40 de 1 de mayo de 1945, según enmendada, con el propósito de proveerle y ayudar a proveer a los ciudadanos los servicios de alcantarillado sanitario y de acueducto o distribución de agua potable.

5. En el lugar donde la parte demandante alega que ocurrió el accidente existe una caja soterrada de contador de agua empotrada o incrustada en la acera.

6. Eleazar Aldea Torres, Representante de Servicios al Cliente de la AAA que tiene a su cargo las lecturas de los contadores de agua del área donde se alega que ocurrió el accidente.

7. La caja soterrada de contador de agua antes mencionada está localizada en la acera de la calle Cacique, frente a la estructura o edificación número 1954, en Santurce.

8. La caja soterrada de contador de agua antes mencionada está conectada y forma parte del sistema de acueducto o de distribución de agua potable operado por la AAA desde antes de la fecha en que se alega que ocurrió el accidente.

9. La acera en la que se alega que ocurrió el accidente está bajo la jurisdicción del Municipio de San Juan.

10. A la fecha en que se alega que ocurrió el accidente, la caja soterrada de contador de agua antes mencionada se encontraba a un nivel más bajo que el resto de la superficie de la acera, debido a obras realizadas en ese lugar por el cliente del servicio de acueducto ofrecido por esta corporación pública, Sra. Caridad Sánchez Luciano, cuya dirección registrada en los récords de la AAA es 1954 Calle Cacique, San Juan, Puerto Rico, y/o por Joe Velázquez.

11. Caridad Sánchez Luciano y/o Joe Velázquez reconstruyeron la sección de la acera localizada frente a la estructura o edificación número 1954 de la calle Cacique, en Santurce, en o antes del 20 de diciembre de 2016, y dejaron la caja soterrada de contador de agua antes mencionada dentro de un espacio cuadrado o cajón de mayores dimensiones que dicha caja, construido en cemento.

12. El 21 de diciembre de 2016, Olga Cotto, residente en el número 1900 de la calle Cacique, le solicitó al Municipio que investigase si unas obras que se estaban realizando en la acera de dicha calle Cacique, frente a la edificación

número 1954, contaban con los permisos municipales correspondientes. A dicha querella le fue asignado el número 041-042- 139- 04. Ella alegó que, como parte de dichas obras rompieron la acera y tiraron una capa de cemento, según consta en el expediente del Municipio sobre dicha querella.

13. Personal del Municipio de San Juan realizó inspecciones del lugar señalado por la Sra. Cotto en su querella, el 20 de diciembre de 2016 y 26 de diciembre de 2016, y encontraron que las obras de reconstrucción de la acera allí realizadas no habían sido autorizadas por dicho municipio; lo cual le notificaron a Joe Velázquez, quien fue identificado por el Municipio como el propietario de la edificación o estructura número 1954 de la calle Cacique, y le impuso al mismo una multa o sanción de $1,000.00 por la construcción ilegal realizada en la acera.

14. Las obras realizadas por Joe Velázquez y/o Caridad Sánchez en la acera levantaron el nivel de la misma. Además, dichos terceros estaban obstruyendo en ese momento la acera con una caja de plástico, lo cual impedía el paso de personas con incapacidades; lo cual también le fue notificado a Joe Velázquez por el Municipio.

15. Las obras realizadas por Joe Velázquez y/o Caridad Sánchez en la acera levantaron el nivel de la misma. Además, dichos terceros estaban obstruyendo en ese momento la acera con una caja de plástico, lo cual impedía el paso de personas con incapacidades; lo cual también le fue notificado a Joe Velázquez por el Municipio.

16. El 20 de enero de 2017, Joe Velázquez le solicitó al Municipio que reconsiderase y dejase sin efecto la multa que le fue impuesta al mismo por las obras ilegales antes mencionadas; lo cual le fue denegado por el Municipio.

17. Como fundamento para su solicitud de reconsideración de la multa impuesta al mismo por el Municipio, Joe Velázquez alegó que colocó cemento en la acera, "por emergencia", debido a que existía una situación de inundación de la acera por aguas negras y se habían quejado a la AAA.

18. La querella que obra en los récords de la AAA sobre desbordamientos de aguas negras en el área donde se alega que ocurrió el accidente fue presentada el 13 de diciembre de 2018, por Caridad Sánchez, cliente o abonada del servicio de acueducto ofrecido por la AAA, cuya dirección de récord es 1954 calle Cacique.

19. El 13 de diciembre de 2018, Caridad Sánchez le informó a la AAA que ocurrió un desbordamiento de aguas negras; pero no surge del sistema computarizado de la AAA que se registran desbordamientos o descargas de aguas negras en las fechas cercanas a la querella. El lector de la AAA que realizó las lecturas del contador o metro existente en la caja de contador antes mencionado tampoco recordó el haber presenciado algún desbordamiento de aguas negras en ese lugar.

20. El 18 de diciembre de 2018, Caridad Sánchez le informó a la AAA que tuvo que "tirar cemento por otra área del frente para poder accesar [al interior de su residencia]" porque ocurrió un desborde de aguas negras y no tenía acceso al mismo "y ahora la tapa del contador no cae en el hueco por desnivel." Además, ella informó que, "[p]ara

evitar accidentes de peatones, colocó un pedazo de madera sobre el hueco donde se supone que caiga la tapa del contador."

21. Eleazar Aldea Torres confirmó que la caja de contador antes mencionada "tenía antes unas maderas puestas...pa' que quedara flat con el cemento"; por lo que él, al realizar la lectura de ese contador, "...levantaba los trocitos de madera, levantaba la tapa, volvía y cerraba y ponía los trocitos de madera como los tenía la persona."

22. Según el Ingeniero David Rafael Jimenez [sic] Mercado, representante del Municipio de San Juan, de los expedientes que había leído hasta la toma de su deposición, el 7 de octubre de 2024, no surge que se le haya notificado a la AAA algo relacionado con lo que ocurrió en la acera.

23. Más aún, el Municipio de San Juan ha aclarado que la acera está a nivel del contador y que lo que está por encima del nivel de dicha acera es lo que rellenó el residente sin permiso.

24. Según lo declarado por el Ingeniero David Rafael Jiménez Mercado, representante del Municipio de San Juan, le corresponde a quien rellenó ilegalmente su acera resolver el problema.

25. Según lo declarado por el Ingeniero David Rafael Jimenez [sic], representante del Municipio de San Juan, si el tercero que rellenó ilegalmente la acera no resuelve la situación existente en la acera, entonces el Municipio de San Juan "tomará acción pa' entonces hacerlo y...., pues, crearle un....caso....adicional por....cobro de trabajos adicionales."

26. Al momento de la toma de deposición del Ingeniero David Jimenez [sic] Mercado, 7 de octubre de 2024, el Municipio de San Juan no le había solicitado a la AAA su autorización para elevar el nivel del contador porque no había decidido o estaba en proceso de reclamarle al querellado.

27. La compañía aseguradora de la AAA, a la fecha en que se alega que ocurrió el accidente, era MAPFRE; quien expidió la póliza de seguro número 1100218005140, vigente del 1 de julio de 2021 al 1 de julio de 2022.45

28. La póliza de seguro número 1100218005140 dispone, en sus partes pertinentes, lo siguiente:

"[MAPFRE] will pay those sums that [AAA] becomes legally obligated to pay as damages because of ["personal and advertising injury"], "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, [MAPFRE] will have no duty to defend the insured against any "suit" seeking damages for ["personal and advertising injury"],"bodily injury" or "property damage" to which this insurance does not apply. [MAPFRE] may, at [its] discretion investigate any "occurrence" and settle any claim or "suit" that may result. But: (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of

> judgments or settlements under Coverages A or B or medical expenses under Coverage C. <u>No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.</u>" [Subrayado nuestro.]

En resumen, MAPFRE solo está obligada, contractualmente, a cubrir la obligación de indemnizar a un tercero por los daños y perjuicios a los que dicha póliza aplique y que se establezca o determine que fueron causados por la AAA.

29. Bajo los términos de la póliza de seguro número 1100218005140, la AAA está obligada al pago de un deducible de $100,000.00.

30. La obligación o responsabilidad contractual asumida por MAPFRE aplica únicamente al monto de los daños en exceso del deducible de $100,000.00 pagadero por la AAA.

31. La cubierta ofrecida bajo la póliza de seguro número 1100218005140 excuye los "punitive or exemplary damages" (subrayado en el original).[8]

Asimismo, el foro *a quo* dispuso que los **siguientes hechos estaban en controversia**:

1. La existencia y naturaleza del desnivel alegado[.]

2. Si con anterioridad a la ocurrencia del accidente que motivó la presentación de la demanda, la AAA tenía conocimiento efectivo del desnivel entre la acera y la caja de contador de agua.

3. De ser así, si la AAA tenía el deber legal de actuar ante tal condición.

4. Si la omisión en corregir o advertir sobre el desnivel entre la acera y la caja de contador de agua contribuyó causalmente al accidente.

5. Si el desnivel entre la acera y la caja de contador de agua fue la causa próxima y adecuada del accidente sufrido por la demandante.[9]

Cónsono con estas determinaciones de hechos, el foro primario concluyó que "la controversia sobre si la AAA incurrió en negligencia — por acción u omisión— al permitir la permanencia de una condición riesgosa vinculada a su infraestructura pública, requiere prueba en juicio, tanto en cuanto a la credibilidad de los testigos como a los elementos de conocimiento, deber y causalidad".[10] Por consiguiente, declaró *No Ha Lugar* la solicitud de sentencia sumaria instada por los Peticionarios.

---

[8] *Íd.*, págs. 4-9.
[9] *Íd.*, págs. 9-10.
[10] *Íd.*, pág. 17.

Inconforme, el 14 de julio de 2025, los Peticionarios acudieron ante esta Curia mediante el recurso de epígrafe y esgrimieron el siguiente señalamiento de erro:

> Erró el TPI al denegar la solicitud de sentencia sumaria parcial presentada por la AAA y MAPFRE por considerar que, "[s]i con anterioridad a la ocurrencia del accidente que motivó la presentación de la demanda, la AAA tenía conocimiento efectivo del desnivel entre la acera y la caja de contador de agua", la misma tenía "el deber legal de actuar ante tal condición".

El 16 de julio de 2025, emitimos *Resolución* en la que le concedimos hasta el 24 de julio de 2025 a la parte Recurrida para que expusiera su posición en torno al recurso. Oportunamente, el 21 de julio de 2025, la señora Harrison compareció mediante un escrito intitulado *Posición de la Parte Demandante Recurrida al Certiorari Presentado por la A.A.A. y MAPFRE.* A su vez, el 23 de julio de 2025, el Municipio y Óptima comparecieron mediante *Oposición a Petición de Certiorari.* Con el beneficio de la comparecencia de las partes, procedemos a exponer la normativa jurídica aplicable al caso de autos.

## II.

### A. Certiorari

"[U]na resolución u orden interlocutoria, distinto a una sentencia, es revisable mediante *certiorari* ante el Tribunal de Apelaciones". *JMG Investment v. ELA et al.*, 203 DPR 708, 718 (2019). "El recurso de *certiorari* es un vehículo procesal discrecional que permite a un tribunal de mayor jerarquía revisar las determinaciones de un foro inferior". *Rivera et al. v. Arcos Dorados et al.,* 212 DPR 194, 207 (2023). Véase, además, *Torres González v. Zaragoza Meléndez,* 211 DPR 821 (2023).

La Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R.52.1, establece que el recurso de *certiorari* solo se expedirá cuando se recurra de (1) una resolución u orden sobre remedios provisionales

o *injunction* o (2) la denegatoria de una moción de carácter dispositivo. Por excepción, se puede recurrir también de: (1) decisiones sobre la admisibilidad de testigos o peritos; (2) asuntos de privilegios; (3) anotaciones de rebeldía; (4) en casos de relaciones de familia, o (4) en casos que revistan interés público. *Íd.* De igual manera, puede revisarse "cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia". *Íd.* Los límites a la facultad revisora del foro apelativo tienen como propósito evitar la dilación que causaría la revisión judicial de controversias que pueden esperar a ser planteadas a través del recurso de apelación. *Scotiabank v. ZAF Corp. et al.*, 202 DPR 478, 486-487 (2019).

No obstante, la discreción del tribunal apelativo en este aspecto no opera en un vacío ni en ausencia de parámetros. *BPPR v. SLG Gómez-López*, 213 DPR 314, 337 (2023). La Regla 40 del Reglamento del Tribunal de Apelaciones, según enmendada, *In re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 42, 215 DPR __ (2025), señala los criterios que se deben tomar en consideración al evaluar si procede expedir un auto de *certiorari. Íd.* Estos criterios son:

(A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.

(B) Si la situación de hechos planteada es la más indicada para el análisis del problema.

(C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.

(D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

El Tribunal Supremo ha expresado que la discreción es "una forma de razonabilidad aplicada al discernimiento judicial para

llegar a una conclusión justiciera". *Mun. de Caguas v. JRO Construction, supra*, págs. 712-713. No obstante, "[a]l denegar la expedición de un recurso de *certiorari* en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión". 32 LPRA Ap. V, R. 52.1.

### B. Sentencia Sumaria

La sentencia sumaria es el mecanismo procesal cuyo propósito principal es facilitar la solución justa, rápida y económica de los litigios que no presentan controversias genuinas de hechos materiales y, por lo tanto, no ameritan la celebración de un juicio a fondo. *Soto y otros v. Sky Caterers,* 215 DPR___ (2025), 2025 TSPR 3, pág. 10; Véase, además, *BPPR v. Cable Media,* 215 DPR___ (2025) 2025 TSPR 1. La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R.36, permite que, en un litigio, cualquiera de las partes le solicite al tribunal que se dicte sentencia sumaria a su favor, ya sea sobre la totalidad o cualquier parte de la reclamación solicitada. Reglas 36.1 y 36.2 de Procedimiento Civil, *supra.* No obstante, para que una sentencia sumaria proceda, es necesario que de los documentos que la acompañan, surja de manera preponderante la inexistencia de controversia sobre los hechos medulares del caso. *Soto y otros v. Sky Caterers,* supra.

Para poder demostrar eficientemente la falta de controversia sobre hechos esenciales, el promovente de la sentencia sumaria debe: (1) exponer las alegaciones de las partes; y (2) desglosar en párrafos debidamente enumerados los hechos sobre los cuáles, a su entender, no hay controversia. Regla 36.3 de Procedimiento Civil, *supra,* R. 36.3.

En *Meléndez González et al. V. M. Cuebas*, 193 DPR 100 (2015), el Tribunal Supremo estableció "el estándar específico" que debe utilizar este Foro al "revisar denegatorias o concesiones de

Mociones de Sentencia Sumaria". A esos efectos, el Tribunal dispuso que:

> el Tribunal de Apelaciones debe: (1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679 (2018).

Es decir, planteada una revisión de sentencia sumaria, el Tribunal de Apelaciones está en la misma posición que el Tribunal de Primera Instancia para resolver, por lo que debe evaluar las mociones presentadas en el foro primario y cumplir con los requisitos dispuestos en la Regla 36 de Procedimiento Civil, *supra,* al emitir su dictamen. *Meléndez González et al. v. M. Cuebas,* *supra.* "[L]a revisión del foro apelativo conlleva examinar *de novo* el expediente de la manera más favorable hacia la parte que se opuso a la solicitud de sentencia sumaria en el tribunal de instancia y realizando todas las inferencias permisibles a su favor". *Birriel Colón v. Econo y otros*, 213 DPR 80, 91-92 (2023) citando a *Meléndez González et al. v. M. Cuebas, supra.*

En tal sentido, como parte de nuestra función revisora, es nuestro deber evaluar todos los documentos que obren en el expediente de manera tal que, previo a determinar la procedencia de una solicitud de sentencia sumaria, se deba realizar un balance adecuado entre el derecho de todo litigante a tener su día en corte y la disposición justa, rápida y económica de los litigios civiles. *BPPR v. Cable Media,* supra*,* pág. 9 (citas omitidas). Cónsono con lo anterior, en el ejercicio de nuestra función revisora, estamos limitados a: (1) considerar los documentos que se presentaron ante

el foro primario; (2) determinar si existe o no controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se aplicó correctamente. *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 994 (2024).

Por otra parte, nuestra más Alta Curia ha definido el concepto hecho material de la siguiente forma: un hecho material o esencial es "aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". *Consejo de Consejo Tit. v. Rocca Dev. Corp., et als.,* supra, 215 DPR___ (2025) 2025 TSPR 6, pág. 15. Por ende, la parte promovente tiene el deber de exponer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material. *Soto y otros v. Sky Caterers,* supra, pág. 11.

Por su parte, la Regla 36.4 de Procedimiento Civil, *supra*, dispone que si en virtud de una moción presentada bajo las disposiciones de esta regla no se dicta sentencia sobre la totalidad del pleito, no se concede todo el remedio solicitado o se deniega la moción, y es necesario celebrar juicio, será obligatorio que el tribunal resuelva la moción mediante una determinación de los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial y los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos. De la misma forma, el tribunal deberá establecer hasta qué extremo la cuantía de los daños u otra reparación no está en controversia, ordenando así que los procedimientos ulteriores sean justos en el pleito. *Íd.* A tono con lo anterior, la precitada regla establece que, al celebrarse el juicio, se considerarán probados los hechos así especificados y se procederá de conformidad. *Íd.*

### III.

Expuesto el marco jurídico y ponderados los argumentos presentados por las partes, resolvemos que no se han producido

las circunstancias que exijan nuestra intervención en esta etapa de los procedimientos. Al amparo de los criterios que guían nuestra discreción, no intervendremos en la determinación recurrida. En el presente caso, los Peticionarios no han demostrado que el foro de instancia se excedió en el ejercicio de su discreción, ni que erró en la interpretación del derecho. Tampoco constataron que el abstenernos de interferir en la determinación recurrida constituiría un fracaso irremediable de la justicia en esta etapa de los procesos. Por lo cual, somos del criterio que en el presente caso procede que se deniegue el recurso de *certiorari* de epígrafe.

Nuestra determinación de no intervenir en los méritos de la decisión recurrida en estos momentos no constituye una adjudicación de la controversia existente entre las partes ni prejuzga el asunto planteado por estas.

**IV.**

Por los fundamentos anteriormente expuestos, **denegamos** el recurso de epígrafe.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones